is 23-6175 United States v. Orelien. At least that's my best shot at pronunciation. Good morning, Your Honors. Did I get that pronunciation right, Counsel? Is it Orelien? As far as I know. All right. I have to admit that I'm not so sure about that either. All right. I see that you have reserved two minutes for rebuttal. Yes. If you're prepared, you may proceed. Number one, I believe that even under a plain heiress standard, the indictment should have been dismissed. Under Parks and other cases by this court, the interstate commerce is a jurisdictional element that has to be there to give the court power. A Rule 29 objection, whether it's made or not, doesn't necessarily change that, particularly if there's not enough for a crime to face a case in the prosecution's case. And I don't believe there is. The money really came in part from advertising that was available across state lines. And, in fact, the people came from across state lines, didn't they? No. No, there's no evidence that anybody came across state lines. I guess you're talking about City Guide. Yes. But the City Guide, if you look at the transcript, she was getting that on a day-to-day basis. Apparently, as far as you can tell from the record, and obviously she doesn't say this one way or the other, she's paying $5 or $10 to put it up for one day. That's what she testified to. It seems to me that's not quite an advertisement that's relevant to interstate commerce. I mean, it may go across state lines, and I don't think there's any evidence on the record. She testified that people could see the ad across state lines. She did, yes. But that is different, I agree, than testifying that somebody came in. What about the depletion of assets sort of theory of jurisdiction? This idea that what they took was her cell phone that allowed her to do business and $4,000 that she had collected presumably from the business. It was her only source of income. And she was spending money on hotels in which to do her business and on the advertising and presumably on the cost of the business cell phone and indicated that she had planned to use that money to return out of the country to her home country. I mean, the standard is so low under our case law, this de minimis standard. You think those things put together are insufficient to cross the threshold? I mean, I really don't because, like I said, there's no real evidence that anybody from while she was doing, at the time this happened now. I understand there's evidence that later on she went to New Jersey and had New Jersey clients. But there's no evidence that during the time she was in New York, she was bringing in New York clients. So it seems to me that, and also, prostitution is a traditional local crime. I mean- So is robbery, right? I mean, whatever you think about the Hobbs Act law, the sort of precedent that's evolved, robbing a local convenience store that gets its canned tomatoes from Brazil seems to be enough. I don't know that there's really any evidence that she was being kept from using material that was going interstate. There's stuff in there, there's evidence in there about she was using condoms, she was using other things. But there's no evidence that those condoms actually were either bought at a place that got them from an interstate source or anything like that. So it seems to me that ought to be there. Is the use of the cell phone, presuming for the sake of argument that all of her customers were inside New York State, is the use of the cell phone insufficient to trigger the interstate commerce element of her business? I think it's undisputed she used a cell phone. But we'll assume for the minute that all of her customers, everyone who contacted her about her business was located within New York State. I don't think so, but obviously you may disagree. No, I'm, you know, the use of cell phones is often used, right, to trigger interstate commerce. Because wouldn't the use of the cell phone in the modern era then turn everything into something that would be interstate commerce? It sure would. Would there be anything left of interstate commerce after that? Seems to me it would not.  I mean, obviously if we knew that she was bringing in clients from interstate and there was actual proof of that. I know the prosecution's going to talk about the cell phone area codes. But the area codes on the cell phone go with the phone. They don't go with the state. I have six people that work in my chambers. Every one of us has a different area code. And all of us work together in one room. Exactly. I'm not terribly persuaded by the area code argument. And just to return for a moment to the website argument. Say that again? She had a website, right? Not on the website, no. At least I don't see that in the testimony. What she had, she used this place, City Guide, and she talked about how much she paid. She said, well, I paid $5 for a day to put up a thing for a day, another $10 to put it up for another day. There's no indication that she had a regular website there. There is an indication, conceitedly, that she used that site periodically to try to get clients. And of course, the City Guide- You say she puts it up. Does that mean it's online? Yes, it does mean it's online. I'd like to move on to the second point, which is the obstruction of justice. I don't believe there's any basis for the obstruction of justice in this case. First of all, there's no statement by any witness that was inconsistent with what he said about using OxyContin. What about his statements in the PSR interview? First of all, we don't even know what that statement was. Well, we know what the PSR reported, and we know that statement was not objected to. Well, we still don't know what it was, and it's a conclusory statement. In an actual hearing, I don't think you could get either of those statements in, because it's just this generalized thing. And remember, those conversations were taking place with regard to his general drug activity. We don't know anything about what the question was, what the answer was. Think about how we make a direction to the jury that, to some degree, a question is part of the answer, but we don't have any question or any answer. We have a conclusion by these reports. It's a pretty specific, I'm focused only on the PSR, not the bail report. Okay. Because the bail report doesn't say the words Oxycodone, and there's a lot of reasons bail reports are tricky. But in the PSR, he's asked, have you used Oxycodone? And he says, yeah, I used it once when I was 18 or 19. I think that's right, and I haven't used it since. Because he's never asked, did he use it that night? Nobody has said that. He tried Oxycodone on one occasion when he was 18 or 19 years old. He reported no subsequent use of Oxycodone. I don't know how else to read that. Well, that would be an implication, that he must not have used it that night. But realistically, I don't think that's a realistic implication when you come right down to it. If you're sitting there and she's asking you, well, do you have a problem with Oxycodone? Well, I used it once when I was a kid. Did that one mention that he used it the night that he was arrested? Why not? This is the PSR interviews after the suppression hearing when he openly testified to that. I understand that. But nonetheless, it's not the kind of evidence that's been used to find obstruction in the past. In the past, there were very clear things. There were things like other witnesses who said, this is what happened, and that person said, this is what happened. This is like an implication from a report that took place a long time after that night. For all we know, he could have forgotten about it. Was the statement regarding the Oxycodone designed to further his claim that his statements were not voluntary? Well, they were admitted on that issue, yes. But I don't know that I would say designed, because that would concede that he was actually lying about them. I don't actually believe he was lying about them, but that's my thoughts. But this is just one of those, when you could talk, and I've represented many criminal clients, and they're not necessarily clear about anything. But I don't believe that's quite enough to find that he obstructed justice. An implication from other statements that were not under oath, that we don't know the questions that were asked, we don't know the actual answer that he gave, we don't know if his attention was brought to the question of, did you use it the night before? We don't know any of that. And it seems to me it's pretty hard to evaluate that, even under a preponderance of the evidence standard, and adding extra time on a man's sentence because of that. All right, thank you, counsel. You have reserved some time for rebuttal. We'll hear from you again. Okay. We'll hear from the government. Mr. Mead, you have ten minutes. May it please the court, my name is AUSA Kevin Mead. I represent the government on this appeal, as I did at trial below. I'd like to start with the interstate commerce issue, which is unpreserved and therefore reviewed under a plain error standard. The evidence at trial established that the defendant targeted the victim in this case because she was a prostitute and to target the proceeds of her prostitution business. There are therefore two ways that this court can affirm the conviction. First, the court can hold that all robberies that target the proceeds of a prostitution business per se meet the interstate commerce requirement of the Hobbs Act. The Supreme Court made a similar holding in Taylor v. United States in the context of robberies of drug dealers, and the same logic applies to robberies of prostitution businesses, which is also commerce over which the United States has jurisdiction, which is the language that the Hobbs Act uses. The Fourth Circuit has held that there is a per se rule that robberies of prostitution businesses meet that interstate commerce requirement, and we're aware of no circuit court that has disagreed with that holding. Alternatively, the court can hold that this particular robbery of a prostitution business meets the interstate commerce requirement of the Hobbs Act. The facts proving that at trial are, one, the victim paid to advertise on a prostitution website which could be viewed outside of New York City, and the defendant even located her through that website. Two, the victim had business expenses such as a cell phone used solely for the business, the purchase of condoms, and the purchase of hotel rooms. Those expenses affected interstate commerce, and the robbery depleted her of the assets of the business, which she would have used for some of those expenses and for that business. Three, the victim had hundreds of communications on her work cell phone, the cell phone that she used only to set up dates, with non-New York phone numbers, showing that she had clients from out of state. All right, counsel, again, you've heard my comment. I think, I don't know, we could take an informal poll, but I don't think the lack of a 212 area code anymore means anything. To your honor, I think if there had been one phone call, I completely agree with your honor that that wouldn't be particularly appropriate. I think, though, when you can show that there are hundreds of phone calls and messages from phone numbers from adjoining states, and we focused below on phone numbers from area codes in New Jersey and Connecticut. But did you actually, did the government take the next step with any of those phone numbers to determine where the user, what their registered address was with the cell phone account? We did not submit that to the department. So all we have is the area code? That's correct, your honor, and there is a low bar here in this case, given the standard. And then finally, the defendant herself worked in interstate business. There were records introduced. She testified that she sometimes worked at hotels in New Jersey. Well, didn't she testify that the difference between interstate business and, like, I worked for a while in Washington, D.C., and now I work in Connecticut. That doesn't mean that I'm working interstate. The testimony that I read suggested that she spent a few months working out of New Jersey and a few months working out of New York. It didn't suggest she was going back and forth. I don't think she was going back on a daily basis or anything like that, your honor. I think she had a long-term, the way I would describe it is she had a long-term prostitution business that operated out of the tri-state area. So you could have an intrastate business in one place followed by an intrastate business in another, right? I think that's right, although it kind of depends on how close in time the victim is moving back and forth. Here there's evidence that before the robbery she was working sometimes in New Jersey and that right after the robbery she moved to New Jersey to work there. And I think kind of the frequency with which she was going back and forth indicates that this was— And what was that frequency? That was my question. I thought we simply had testimony about maybe three distinct periods. I didn't recall there being this frequency of her going back and forth. So I think that the testimony, as I recall it, is she was at a Howard Johnson about five months before the robbery in New Jersey. She then moved to New Jersey right after the robbery. And I think she just testified generally, I sometimes worked in New Jersey. I think any of those factors— there's a very low bar for interstate commerce under the Hobbs Act and we're under a plain error standard. I think any of those four factors individually are sufficient. I think in total they're clearly sufficient here. Could you remind me in terms of about the jury instruction? When the judge instructed the jury regarding the elements of the crime, how detailed was the instruction on interstate commerce? So the jury instruction is pages A530 and 531 of the appendix. There was no dispute about the jury instruction, and my understanding is it was the relatively standard jury instruction that is given in these cases. It's a few paragraphs. There is some level of detail in it. And there is a discussion about whether there's a robbery of a business or an individual. But given the lack of any argument about the jury instruction, either below or here, I think the court can assume that the jury instruction in this case was proper. Well, the reason I ask is, again, reviewing the evidence, if we review it under the plain error standard, it is of interest to know what was the principle that might have informed the jury as delivered by the judge in the instructions. I can read it for the court now if that would be helpful. The fourth element, and then we're going to come to aiding and abetting, the fourth element of the robbery, the offense charged in count two, is that the government must prove beyond a reasonable doubt that the robbery affected or would have affected interstate or foreign commerce. Counsel, I don't think we should read the entire instruction. Sorry, Your Honor. Having sat through many, many jury instructions, I know it takes a while. But we are at pages 530 to 531 or 532. Do you want to pull out something specific that you think is particularly germane? Sure, Your Honor. Or that the defendant targeted the victim because of his or her status as an employee of a business participating in interstate commerce, or that the harm or potential harm to the victim would deplete the assets of his or her business operating in interstate commerce, or that the crime targeted the assets of a business rather than an individual. So I think that's an accurate description of the law here, Your Honor. Even if you're right that the Commerce Clause in some fashion covers this activity, is there some special reason you care to share with us why the government doesn't leave this case to New York to prosecute a routine robbery? I think that there are difficult decisions about whether any case is charged federally or by the state. I don't want to get into the exact details of why a case is brought federally or in the state. It has to do with the investigative resources available to each sovereign. It has to do with sometimes the potential penalties. This is a violent, brutal robbery by an individual with a lengthy criminal record, and it seemed like an appropriate use of federal resources to prosecute. Do you know which law enforcement agency first brought this to the government's attention? The agency partner in this case was the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Your Honor. It was not local police? So the ATF works frequently with the NYPD. There's actually a joint robbery task force between the ATF and the NYPD, and that is the task force that was investigating this robbery. So the joint task force, the federal side of it was Alcohol, Tobacco, and Tax? And Firearms, Your Honor. And Firearms, because they had a gun when they went in? I admit I'm not an expert on exactly where ATF chooses their cases. I know that they very frequently prosecute robberies. It's one of the areas that they focus on. I admit it's, of course, not in the name of their agency, though. Turning just briefly to the obstruction point, the district court properly applied that enhancement based on the defendant's false testimony at a suppression hearing that he had taken one pill of oxycodone the night before he was arrested, and that that was the first time that he'd ever taken oxycodone. Those sworn statements that he made in an affidavit, on direct and on cross, were directly contradicted by his recorded post-arrest statement, his answers to pretrial services in the pre-sentence report, and his answers to the probation department in the pre-sentence report. The district court found that the defendant's testimony, which it heard firsthand and had the opportunity to evaluate, was a lie and that it was immaterial. No sworn testimony is required to establish the defendant's lie. The district court was not required to hold a hearing. It can use any source of evidence it wants in the context of making the preponderance finding of sentencing. And the district court's finding was sufficient, particularly under an abuse of discretion standard. And that's the standard for obstruction enhancement? So I think that's the standard, Your Honor, generally for a sentencing enhancement is abuse of discretion, and it combines both a kind of factual component under a sentencing enhancement, which is reviewed, I think, for clear error, and then the legal determination as well. But the legal determination of whether the facts constitute obstruction, that's a de novo review, right? That's exactly right, Your Honor. But I don't think there's any dispute that lying during a suppression hearing could constitute obstruction of justice. Thank you. Thank you. I have just a very, very brief. The government argued that the Fourth Circuit had found that these were per se. I take it he means Mohammadi and Lopez. Those cases did not find that. What they did was they looked at the specific facts of each case, both of which had an interstate component and said this was an interstate business. That's what I'm urging this court to look at and find that it's not an interstate business. And that's all I need to say. Oh, well, one more thing. The court also, and this court has held, that in order to find obstruction, you have to find that the person intentionally tried to, you know, obstruct justice, and there couldn't be any kind of a mistake. It has to be sufficient to eliminate the possibility of mistakes, confusion, what have you. Given the way this went down, and in particular, the fact that that man, when he was arrested, no matter whether you even talk about the oxycodone or not, he was high as a kite because he was taking marijuana. According to him, he took more than ten shots of Hennessy. If I took, well, at this point, if I took more than one shot of Hennessy, I would fall on the floor. But focusing on the PSR, though. Yep. If you set aside the bail hearing entirely, let's say we don't even consider it, he says it was my first time when he testifies at the hearing, and in the PSR he says I tried it when I was 18 or 19. Yeah, that's true. But the point is, again, we don't know how that was presented to him. We don't know any of the facts about what the exact words he say or the exact thing he was asked. It seems to me that's not sufficient to make his penalty higher. And that's all I have to say. Thank you. All right. Thank you, counsel.